Good morning, Your Honors. My name is Jack Clark. I represent the Riverside Cnty Office of Education, appellant in this matter. Your Honors, I would like to highlight three points of argument this morning. The first, and most important, is the, both the administrative law judges and the trial court below, failure to properly apply the difference between the standards under educational law, under the IDEA, in terms of what is an educational placement, and the standards of the Welfare and Institutions Code, which was fully set forth by the State California Court of Appeal, in terms of determining where a child should be placed. And I'm going to try to separate those terms, in terms of a disposition hearing, after a finding of responsibility for a violation of California juvenile law. I want you to get into that, but look, I've got a preliminary question, so I understand what's at issue here. And actually, that's the question. What's at issue here? I'm not sure what's left. I mean, the county has already made the recommendation the judge directed the county to make. The judge was not persuaded. Yes. The county is no longer responsible for J.H., who's held by the state. Is there any practical result to come from this hearing? Very much so, Your Honor. What's that? The concern here is that the IDEA should not be used for purposes that it was not intended by Congress. But what can we do to help you with that? I mean, you already tried to intervene and were denied. If we rule for you, do you take any other action? Do they have to take any other action? What would happen? If you rule for us, because there are two aspects of this, if you rule for us, and we believe that the administrative law judge in particular did not consider powerful evidence that showed that J.H. made educational benefit during the two-year period he was incarcerated in the juvenile hall and being educated in the juvenile court school. But even if we agree with you, what difference does that make? What will happen? It makes a significant difference, Your Honor. In that situation, then Riverside County Office of Education would not be required to provide compensatory education because you recall that one aspect of the judge's order was that we were to try to provide speech and language services in the Division of Juvenile Justice Facility in Northern California. But your brief didn't talk about that. I mean, as far as we know, that's already been accomplished or it has to do with a particular deficiency, not the broad proposition as to whether J.H. had made any educational process. I mean, there are lots of cases that we get, as surely you're familiar with, we get lots of I.D.E. cases, and there are many of them where there's general progress, but there's a particular deficiency, and so some degree of compensatory education is required. As far as I can tell, I mean, your brief didn't tell me why compensatory education, as such, shouldn't be required, so I didn't view that as being at issue. We thought we did, Your Honor, in the extensive section, actually pages 35 through 40 of our opening brief, where we explained in detail that there was substantial evidence to support not only from the Riverside County Office of Education witnesses, but from four witnesses in the Division of Juvenile Justice, which established that J.H. had made progress. Well, I understand that, but what I was posing to you, or what I was trying to pose to you, was that we see lots of cases where there's an argument or an issue as to whether there's been progress, but there is also, even if the Court determines there has been progress, there may be some specific deficiency, short of not having any progress at all, some specific deficiency that says, but we still need some degree of compensatory education or sessions for this particular problem. And I didn't see discussion in your brief, a lot of discussion, certainly, about progress, but the specific deficiency that prompted the ALJ to say this speech, these speech sessions, maybe it's covered by your general discussion, but I confess I never picked up through your brief that a challenge to the compensatory education was really on the table here. Your Honor, that's the thrust of our point. If indeed, the argument, as we understood it by the appellee below, was he'd made no progress. Yes. But I thought they made that argument, the way I understood it from your brief was they made that argument in order to say that he should have had a residential treatment placement. Yes. But the only relief that they asked for, which we can ask your opposing counsel about why they didn't ask for other relief, but it seems like the only relief they asked for was that you try to intervene and make this recommendation. And those things seem to have happened unsuccessfully, and they're done, and now I don't know what's left. But the problem is, Your Honor, the reasoning that was used by the courts below is left out there and has been affirmed by the trial court. But is it precedential in another case? I mean, it seems like it's only related to this child. We believe it would be precedential, Your Honor, because the argument could be made for every child who's on an IEP who's incarcerated in a juvenile hall in the state of California. So why don't we hear the appeal in the next child's case, then? I don't understand why we would reach out to try to just announce some law in this case when it doesn't have any effect on what would happen with this child. But that's the problem in almost all IDEA cases, Your Honor. Under the IDEA, when an administrative law judge orders a remedy and the trial court, even if the trial court reviews, as opposed to other civil litigation, there's not a stay. So the case proceeds on. So you're essentially arguing capable of repetition but evading review? Very much so. Does this happen very often? Yes. In fact, you can see in the arguments that we made and that AFLE made in response to our brief, they're asserting that there's cases that are actually administrative law cases that support them. In fact, the district court cited another district court, the Humboldt case, which was on order on a motion to dismiss TR versus Humboldt County Office of Education, and asserted that it would support what the district court trial court did. So indeed, Your Honor, if this case is not reviewed and reversed, it will have a very significant precedential effect. I need to expand on that. And it's going to be a very important effect in terms of the difference between what Congress intended through the IDEA, which was to make sure that the members, the children of our community who have disabilities that make them eligible receive educational benefit and the support they need to receive an education. It was not intended. And Congress, in the reauthorization of the IDEA in 2004, in 1997 actually, made it clear that the state should not be precluded from applying its juvenile court laws to an individual student who happened to be on an IEP. Well, that's not an issue here, though. There's no question, but the juvenile court had the last say. Juvenile court wasn't swayed by the recommendation that the county was required to make. So I don't see how that's offended. It is offending, Your Honor, because particularly in the way that the administrative law judge ordered us to do it. The administrative law judge, who knew that the case had been closed, ordered us to try and find a residential treatment center. And I'll address the issue in terms of the infirmity of the administrative law judge's order in that, because it was not an educational-based order. But he ordered us to try and join the matter after the case had been closed. We believe that's strong, strong evidence that an educational tribunal is trying to directly affect a state court, juvenile court proceeding. And that should not be allowed. Yes, but affect, not control. I mean, why can't, why couldn't it be reasoned that, you know, the juvenile court should at least hear from the educational expert, and if, in this case, the educational expert recommends residential treatment center, take that as one of the, part of the broth for the juvenile court to consider. But the juvenile court's not required, and this case did not. Because, because the educational analysis in terms, and I thank you for that question, because it goes to the core of our position. The educational analysis in terms of residential treatment center is not at all connected with the overall analysis, as the California Court of Appeals said, the myriad factors, including, and this is important, including the concept of public safety. An IEP team is required to provide special education and related services that are reasonably calculated to provide some educational benefit in the least restrictive environment. The combination of those factors will control an offer of educational placement. Under the Rachel H. case of the Ninth Circuit of about 23 years ago, and the progeny of that case, there are four factors in terms of least restrictive environment. Not one of those factors, not one of them, concerns public safety. Or, or, and it's in the Welfare and Institutions Code. But so the juvenile court can have the concern about public safety. What's wrong with making an educational recommendation that then gets considered in the mix? Because in the disposition hearing, Your Honor, and this is the core of the matter before the court. Whether you're in a state penal institution or a juvenile court facility, that is where you are placed. You are not in the community. We cannot make a determination of whether you should be in a general education classroom, a special education classroom, a non-public school, or the most restrictive environment. But no one asked you to make that determination. They asked you to think about it and make a recommendation from the educational perspective, and then tell the court what you thought. And then the court can reject it just like the court did. But in so doing, Your Honor, we're making, we're making a recommendation that has no connection to the juvenile court proceeding. In other words, we're making a recommendation. Well, we don't know that though, right? The juvenile court maybe is an equipoise. We think either of these placements would be okay. And so maybe the educational input would tip the balance. And that's exactly, but it's, it's, if, if the, if the, if the court were an equipoise in terms of the services that were needed. And let me put it this way. If the child needed a quote unquote residential treatment center, then whether you're in state prison or whether you're in juvenile hall in a court school, then in that setting, you would need to bring in the services and facilities that would approximate or recreate a residential treatment center in that facility. It is a misnomer to suggest that an IEP team can say to a juvenile court, we believe that this child should be placed somewhere that would be considered generally in the community. That's the problem here. Because I thought part of your defense was that the court did recognize that there was an IEP. I mean, the juvenile court did think about the educational needs here. As it's required to do, but it's the, it's the elements of the educational need, not the place. And if, if we were in the community, if we were not incarcerated in a situation of incarceration, the IEP team could make a recommendation from anything from a comprehensive school campus to home, to a home placement. And let me put it that way. Could we, because of a child's illness, suggest that the child be placed at home and given home hospital instruction? That would make- I mean, it seems like you could recommend it and the court could say no way. It would make, it would make no sense in that, and we're going through an analysis that, that's, that's fictional. And we, and, and the, and the concern that was raised by the, by your honor in just a moment ago, is of great concern to us as a, as a local educational agency. That somehow the recommendation of the local educational agency for a residence treatment center might actually have some, some sway. Because, well, teachers are suggesting this. But we would, we would be hamstrung because we would not be able to give the, a true recommendation in terms of overall true placement for this student under the juvenile court. It would be, it would be in our, in, in, in our view, and I, and I think properly so, in, especially in light of what Congress said, that it does not prohibit the application of juvenile court law to students who are on IEPs. It would disrupt and, and confuse the discussion for the, the California State Juvenile Courts. So, section 4-1, sorry, 1-4-1-4-D-7-A talks about modifications of an IEP for a student who's incarcerated, but only if convicted as an adult and incarcerated in an adult prison. And I'm referring to 1-4-1-5 subdivision K-6. Right, but, so, it seems like there's some tension between those two. I, I don't believe so, your honor. K-6 says, and judicial authorities from exercising the responsibilities regard the application of federal and state law crimes committed by the child with a disability. We, we submit, your honor, if, if school officials in the court schools are coming in and saying, we believe this child should be placed someplace outside of the juvenile justice system, that will confuse the issue and actually could do, do harm to the juvenile justice system. Well, sentencing judges, and, I mean, Judge Donato does that as, as day job, have to deal with recommendations from lots of different perspectives. It's not that the court is incapable or the juvenile court here was incapable of sorting out the perspectives of the different people making recommendations. Again, your honor, but there's nothing, the, the IDEA makes it clear that for incarcerated students, their placement is court school. And, and remember, your honor, that. Well, could the juvenile court on its own have concluded that the appropriate way to confine J-H was placement in a, a juvenile residential treatment center? I mean, there was even discussion, I've forgotten the name of the facility. It was Copper Hills. Copper, there was specific discussion. That was an option available to the juvenile court, wasn't it? Yes, for purposes, for purposes of juvenile justice law. In other words, if they're looking at the Welfare and Institutions Code 202, the, the, as the Court of Appeal properly found, and they cited controlling California law. Nobody's questioning the ultimate judgment of the juvenile court. The issue here is there, is there a reason why the juvenile court shouldn't have the benefit of the county office of education's view? And, and nobody's trying to say the county office of education has to be blind to the fact that this is somebody who's been held by the juvenile court accountable for second degree murder. So home placement's not likely to be in the cards. But that's the problem, your honor. I am, I'm submitting to the court that IEP teams have to be blind to that. Yes, we have to. Okay, so then you tell the court, we're blind to the, to the danger to the community issue. We're just educators. We're just telling you the educational perspective. And then the court, which is responsible for considering danger to the community, can take it as a factor. Then, your honor, and please remember that the IDEA provides that there are going to be annual IEPs or IEPs can be called multiple times a year. What, what the court would be doing if it were, if it were to uphold this decision, would to be judicially creating an obligation on a part of a local educational agency at the time of disposition in a juvenile court proceeding to give a recommendation that otherwise we do not believe it is qualified to give under the circumstances. The first IEP for J.H. occurred in the fall, actually in the summer of 2011 when he first came in. If the court's reasoning is to be applied in accordance with IDEA law, we would have to consider outside placements every single time we call an IEP. That's the problem. The fit between an educational analysis and a societal analysis in terms of the juvenile justice system is not there, and we are greatly concerned that this case will cause confusion. Can I take you back to 1415K6A? Yes. So doesn't the legislative history of that provision suggest that it's about arrest and ability to prosecute and not what happens in detention? Do you have any case that talks about something like what you're arguing, that that provision affects your ability to make a recommendation about what happens in detention? We don't have a case on point, and that's why we're here today, Your Honor, because it was true that the courts, when the manifestation determination requirements under the IDEA first came in the reauthorized 1997 version of the IDEA, the courts were actually stopping juvenile court proceedings. Well, I thought they were stopping arrests. I thought the issue was arrests like in schools, not incarceration but arrests. In that case, it was an arrest, which, of course, would be a precursor perhaps to incarceration. They were mistakenly thinking that the manifestation determination could extend into the juvenile courts. We believe Congress tried to make it clear that the IDEA was not to intrude upon that function. But it's pretty strange, then, that the other provision we talked about, the D7A one, only talks about adult incarceration. So there seems to be an omission that when you fit the two together, it leaves at least an ambiguity. I can see Your Honor's concern about that. I believe in practice there would be no ambiguity. Again, if an educator comes in and says, we believe this child should go to a residential treatment center, or let's turn it on the facts of this specific case. Remember that it was the Applebee's own expert who testified that this child could be fully educated in a regular education classroom. A regular education classroom would be at a comprehensive school site. And therefore, are we going to come in and say to a court, assuming that the expert's testimony was what's taken properly, we do not believe it was, if that position was to be taken, then we would be recommending that a student who is fully engaged in the disposition process in the juvenile court should be released. Let me just jump in on that because I feel the passion that the district has about this. But I'm just not getting what the burden is on you all to give some advice to a juvenile court that's going to ultimately make the decision for you. As my colleagues have said, no juvenile court is going to say yes, we'll put the person convicted of second-degree murder in a public school, or yes, we will release him to his home. It's just not going to happen. I know it's annoying. I get that. You might have to discuss that, even though there's zero possibility of it happening. But so what? I mean, I just, what is the huge burden that puts the district out so much in this situation? It's the function, and I tried to make this clear in the argument before the court, it's the complexity of the IDEA. We are already in a situation where we're responsible for assessing, providing educational services, and determining what's appropriate. I appreciate it's a process, but this comes up how many times, once, twice a year, five times a year? Your Honor, we're concerned that if this case is left at standing, this will come up multiple times per year. Multiple meaning what, five, seven? No, Your Honor. There are thousands of students who are in the juvenile court schools throughout the state of California. But not in your district. Not in our county office of education. I'm just talking about your client. But we're responsible for all of the juvenile court schools in Riverside County. One county. Four million people. Out of 52 in California. At least. Okay. But I'm still not getting a flavor of why this is so crushingly a burden on the district. Because, Your Honor, we're being asked to do something, one, that makes no sense under the circumstances, and we believe will lead to even further litigation. When we say a burden on us, Your Honor, we're talking about making essentially a decision that's fictional. It's not fictional. You're advising a court on options that the court is not expert in. Your Honor, that's the point. The portion that we're not expert in is the portion that the court has to do. And that was what is at issue here. The petitioner, excuse me, the appellee was asking for us to make a recommendation for placement. The placement was being incarcerated. And we are required to provide services while the student is being incarcerated. For us to go in and say that the child should be in a general education classroom or a residential treatment center is not applying a proper standard in terms of what the juvenile court does. And so, in real terms, Your Honor, we're very concerned that we're going to intrude upon and confuse the juvenile court proceedings and have the IDEA use it. I guarantee you the juvenile court judge is not going to let you intrude upon anything in his or her domain. That's just not going to happen. Well, but in real terms, Your Honor, and we argued this in our reply brief, what's going to happen as a practical matter if we have a dispute concerning the IDEA and the juvenile court proceedings are going on? We then have this disjointed, illogical, we believe, system that creates more and more confusion. Well, the juvenile court here didn't have any problem saying thanks but no thanks. Well, it was because the case was over. Well, there may be a number of reasons. Maybe. But again, isn't there a real concern, a very tight judicial concern, that any judicial officer would order a party to engage in a moot act? That in and of itself should be a basis for a reversal. So, Your Honor, and it's not just passion. It is trying to give effect to a statute that was intended to make sure the children who are incarcerated or in the community have proper services. If you're incarcerated, that is where you're going to be educated. To suggest that a group of educators should recommend. I think I should interrupt you because we've taken you over your time. Oh, I'm sorry. We'll give you two minutes for a rebuttal, but I think we understood the point you were making. Thank you. Good morning, Your Honors. May it please the Court, I am Tanya Whiteleather. I represent J.H., a student with a disability. I have to let you know when I first took over representation of J.H., I was concerned that I had a client who was a sociopath. I had heard about the horrible crime he'd been accused of. I was worried for his safety, for that of others. I looked at the records. I met with him. I talked to another evaluator. I learned that he was a child with a lot of abuse, whose original school district and the Riverside County Office of Ed had ignored his mental health, his behavior, his educational needs, and he was in need of a lot of things, including a residential treatment center. I'm going to try to address the things that were raised by Mr. Clark during his argument. Starting with the concern that we raised, what's left to this case? I think nothing is left. No, there is no, I was going to start with abstention, which I think is just not an issue. Nothing that the juvenile court did had anything to do with education. They never heard anything. They never had testimony. They never looked at educational records. They handled the juvenile court matter, and whatever is done there is separate with the sole exception that in placement hearings, under rules of court 5.615 or 5.1, whichever it is, it's in my brief, the juvenile court takes recommendations upon placement, recommendations from probation. It's in the record. Officer Post researched recommendations and gave her probation officer recommendations. The IEP is the entity tasked with determining educational needs under Congress. IDEA says they will sit down with the experts, do the assessments, determine the needs, address services, and although it doesn't exactly say placement services, part of placement, and make recommendations. Were J.H. not incarcerated, and he's entitled to all the rights, including continuum, were he not incarcerated, the offer here in California would be given to the parents, and the parents would say yes or no, and until the parents said yes or no, a new placement could not be, which is a placement for a year's time. It goes into the future. The placement could not be implemented without express consent from the parent. The court's involvement with an incarcerated student is very much the same. The court relies on the experts, one of those is the IEP team, which is supposed to, pursuant to IDEA, identify all of the needs through appropriate assessment, and by the way, they did it in speech and language, and in SR, I believe it's 269, is in October of 13, I'm sorry, SR 160, S-E-R, was the very first time that a full speech and language had been done, and it was identified just before the start of hearing that he needed speech and language services that were based on a formal assessment, and that was Lorraine Hill from Department of Juvenile Justice's Johanna Boss. The IEP team comes up with the recommendations, makes those recommendations. I trust the juvenile court, whether I agree with the placement or not, I trust the juvenile court to take in all of those recommendations and to make the appropriate placement. One of the things the juvenile court does is determine safety to the community. It is not an IEP determination. The IEP determination is educational, placement services. And could the juvenile court say the only way to maintain safety to the community is to put this person in solitary confinement and give them no education at all? I don't believe so under IDEA because there is, under state law, a requirement that the court consider educational needs, and this is, again, the rules of court, education, special education, and mental health. Because I've been a little bit confused about why you didn't ask for more relief. I mean, it seems like part of our problem here with why there's nothing left is that you asked for a very minimal form of relief, and I'm a little bit confused about whether you think if he's not improving, something else should happen. What had happened until typically in these, these are very assessment-based, we did not have the assessment by Dr. Fuentes. Even as the first day of hearing started, Mr. Clark and I were ordered to go to the IEP because Mr. Fuentes, at the direction of Mr. Clark, had stopped his assessment when Joseph had been temporarily sent to Stockton. So we didn't even have the assessment done, even though Dr. Fuentes could have flown up there to finish it. We had to put off the hearing. And then we got the hearing and we got the information. At the same time, we were getting a private assessment from Dr. Pissarro. By that time, by the time we were in hearing, we couldn't raise the issues. We did seek remedies. Dr. Pissarro gave a list of remedies. It's in the record, and I won't go over those, but a list of remedies and things that J.H. required. Some reading services, instructional services. He talked about one-to-one, which was ordered for the first time, by the way, in October of 13, or agreed to at the IEP October of 13. We did ask for more. We sought more. We weren't awarded those. But you haven't cross-appealed. We went on further to seek other remedies in other appeals or complaints. We had a subsequent complaint against our Riverside County Office of Ed and the Probation Department. J.H. was transferred up to Johanna Voss. So we've had two complaints against the California Educational Group. So we have been addressing that. So there are other pieces of litigation that are proceeding? We have not currently because we've settled all of them and obtained other remedies. But those were against the state. Because he is up there and was not getting services, even actually ordered. Yes, but we did get those remedies when we had the evidence from the expert assessors, including mental health, which was crucial for this young man. Does he have a habeas case? Is there anything left of the criminal side of this? No, it's been exhausted through the state, and there was actually a petition for certiorari to the Supreme Court. But that was on direct review, right? Do you know if there is a habeas? No, no. There was nothing further. So it's done. It's done. And, again, the Court of Appeals did not address. They made comments, dicta regarding educational needs, but they did not conduct a hearing and they did not review the record. So it's a completely separate matter. The IEP team's duties are very clear under IDEA to make these recommendations. Again, the parent would accept. In this case, it was the juvenile court accepting. And I have yet to have what you suggested, the situation, Your Honor, where the student is put in a room without any education would be fascinating, but I don't think any juvenile court would go there. The student has to have some education, and the court determines that within the safety first, and then how do we meet those needs within safety. If the court doesn't have a recommendation as to what the student's full educational needs are, the court can't make that recommendation. But I'm going to kind of come back to the question. It sounds like all of this is done. If there's no longer anything that the county is responsible for, if it has made the recommendation to the juvenile court that it was required to do, unless there's an issue about the compensatory speech and language sessions, are they still pending, or has that been accomplished by now? That's been resolved. So is there anything left for us to do until we get to the possibility of capable of repetition but evading review? And is that the situation that we're in? That's the situation we're in. We fought long and hard in California with various county offices of education to have them recommend residential placement. The position has long been we can't recommend anything outside of juvenile hall, which there's nothing in IDEA or state law that prohibits an IEP team from saying we think this type of placement would be appropriate to a juvenile court. You're saying that's a statewide position, not just this county? Yes, it's been addressed. The duty of the IEP team to determine appropriate services and placement has been addressed. By whom? The Orange County versus the Citation, for your honors. But there was a case involving the California Department of Education, and it was Orange County Office of Education. When a student goes to juvenile court, the IEP team still continues, or the LEA, local educational agency, continues to have duties to identify the needs of the student. Again, as state law and as 1415 says, the state still may affect whatever orders it needs to. I guess I'm confused. Maybe we miscommunicated. But I thought you were saying that the state of California has taken a position statewide that the Departments of Education cannot make these kind of recommendations. No, I'm sorry. I didn't mean to imply that. We have found in many of our due process matters, with dealing with county offices of education, and this is where I think Mr. Clark is arguing, have said, no, we cannot recommend a residential treatment center. I believe the reason is financial, because if a county office of education makes the recommendation, and again, an IEP is not for today only. It's going ahead into a year's time. If the county office of education makes that recommendation, then they must initiate, and if that's approved by the court, and if the court is involved, they must initiate the payment. That's where I think the problem is. They are concerned about getting on the hook for having to start those. There is authority that says then the ---- So you're saying they're worried, I mean, he didn't say that, I don't think, but you're saying he's worried he would have to pay for the residential placement, that it wouldn't be within the criminal budget? No. No. If the courts, usually what happens, CM is a good example. The CM case that Mr. Clark referred to and I addressed in my answering brief is a very good example. CM was my client. She was in L.A. County Office of Education. She was going to be placed by the court. We had an IEP team meeting. The IEP involving LACO, L.A. County Office of Ed, indicated that yes, she should actually, we went to hearing on that, she should be offered a residential treatment center placement. That's what the young lady need. We took that order to the court and the court then released her. This was the court's order. Instead of ordering a placement, released her to residential with the order that she return and they would continue to follow her progress. The court has the authority to do that. So they didn't place her because they would have been responsible and financially. She was placed by LACO. LACO then under our state laws gave financial responsibility over to the school district, Los Angeles Unified. CM would have gone someplace else had we not identified residential treatment center. And I have been in half a dozen cases where the same thing occurred. A county office of ed, as a student who needs residential, we get the IEP team recommendation and present that to the juvenile court judge. The juvenile court judge makes the determination. And in every single case, we have had nothing as serious a crime as this. But in every other case, we have had the court release the student to be placed in the residential treatment center. So it sounds like you don't need our help. You'd rather us just say this is moot? I think so. I think it is all. I mean, we've done it. I think the law is clear. Let me see if I've got anything else that I need. Because you didn't argue, really, I didn't think that this case was moot. I think I understood where Mr. Clark was going. I understood he's talking policy and it's going to be repeated and poor county offices of education will have to hold IEPs that actually do what IDE says they must do. I disagree. I do want to note that you don't have to use all your time. I'm not sure we have further questions. I was just looking to see if there were anything else. I did want to note that even Dr. Wesson, who was a clinical psychologist with the Riverside County Office of Education, said very clearly in his testimony that he believed J.H. needed a residential placement. Testimony to whom? I'm sorry? Testimony by him to whom? In the due process hearing. So this is to the ALJ, not to the juvenile court? Yes. This was in SR 428. It's in my supplemental, 428.725. This is the clinical psychologist, yet they never made a recommendation. If there are no more questions. Thank you, counsel. We'll give you two minutes for rebuttal. I'm going to try to rely upon cold logic and not passion. In our brief, we cited the testimony directly of Dr. Perry Pissarro, and he said, question, Dr. Pissarro, as I understand your recommendation concerning placement, you were saying there was nothing to prevent J.H. from being able to go into a general education classroom if he were outside the juvenile system. Is that right? Yes. And then he was asked, question, what is your understanding of the role of the actual juvenile court in terms of placement of young offenders? And his answer was this, in part. And so what I'm saying is I'm not sure that a long sentence in the juvenile court system is necessarily going to give him or mediate in regards to some of the things we're talking about here, and that's why I'm suggesting a residential treatment center. In other words, Your Honor, his testimony was geared to try to affect the disposition of the court, not of the juvenile court, not from the perspective of what he needed educationally, but in terms of what he believed placement would be appropriate in terms of not putting them into the Division of Juvenile Justice. That is exactly the thing that LEAs, the local educational agencies are concerned about. So why doesn't someone just object lack of foundation or lack of, I mean, it's irrelevant. He can say the sky is pink or whatever. I mean, he testifies to education and that part's relevant, and when he goes beyond that, it either lacks foundation or is irrelevant or is something, but it's not, the court could just ignore it. But that, again, puts us right in the middle of a proceeding where we're not supposed to be, Your Honor. We're educators. We're not providers for disposition in terms of juvenile court proceedings. So was he her expert? Yeah, so you could object to that part of his testimony, right? Yes, Your Honor, but in administrative hearings, the evidentiary rules are not the same as in courts, and that is our concern, that we're going to be going into court as an educator, a group of educators, be saying we believe this child should be placed pursuant to the IDEA in, say, a general education classroom, and I do believe that there is a real concern that the juvenile court system will be adversely affected by that. Thank you. Thank you. Thank you, both sides, for the very helpful arguments. The case is submitted, and we are adjourned for the week.
judges: Clifton, Friedland, Donato